# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:04CV495-H

| | |
|---|---|
| LANI D. POWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM AND ORDER** |
| v. | ) |
| | ) |
| BANK OF AMERICA, N.A., | ) |
| | ) |
| Defendant. | ) |

**THIS MATTER** is before the Court on the Defendant's "Motion for Summary Judgment ... [with attached Exhibits]" (document #9) and "Memorandum ... in Support ... " (document #10), both filed August 1, 2005; and the pro se Plaintiff's "Response to Motion for Summary Judgment" (document #13) and "Memorandum ... in Support of Response [with attached Exhibits]" (document #14), both filed August 31, 2005.[1] On September 14, 2005, the Defendant filed its "Reply ..." (document #15).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this motion is now ripe for determination.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will grant the Defendant's Motion for Summary Judgment, as discussed below.

---

[1] On August 4, 2005, the Court issued a "Order and Notice to Pro Se Plaintiff of Defendant's Motion for Summary Judgment," advising the Plaintiff of her burden and responsibility in responding to the Defendant's motion and setting the time for filing a response to August 24, 2005. See document #11. On August 24, 2005, after receiving a telephone call from the pro se Plaintiff requesting an one-week extension, the Court re-set the deadline for filing a response to August 31, 2005. See "Order" (document #12).

# I. FACTUAL AND PROCEDURAL HISTORY

This action seeks damages and equitable relief for wrongful termination based on race and retaliation in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e ("Title VII").[2]

In July 1997, the Plaintiff, Lani Powell, an African-American, was hired by the Defendant Bank of America ("the Bank") as a Clerical Specialist in the Bank's California-based Mortgage Banking Center. In April 2000, the Bank closed the Mortgage Banking Center due to a merger, but offered the Plaintiff a transfer, which she accepted, to a Project Analyst position in the Bank's Private Bank Group in Charlotte, North Carolina. When the Plaintiff began working as a Project Analyst, she was supervised initially by Scott Morris.

Taking the facts in the light most favorable to the Plaintiff, her overall performance as a Project Analyst though the time of her termination was at best "consistent," Plaintiff's "Memorandum ..." at 3 (document #14), that is, she performed well in areas such as data entry and customer service, but struggled in the technical, analytical aspects of her job.

At the end of 2000, the Bank began its Private Bank Referral Campaign, which was an internal award program for employees who referred clients to private banking. With approval of Project Manager April Chapman, Mr. Morris assigned Plaintiff to the Private Bank Referral Administration Unit, which had administrative responsibility for the Private Bank Referral Campaign. The Plaintiff admitted in her deposition that her new assignment required her to spend 30% of her time performing data entry, with the remainder of her time being divided between

---

[2]Although the pro se Complaint also stated claims generally under the Americans with Disabilities Act ("the ADA") 42 U.S.C. § 12112, et seq.; the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.; and the Fourteenth Amendment to the United States Constitution, as discussed below, in her "Response ..." the Plaintiff has abandoned those claims and is proceeding only on her Title VII claims. See Document #13 at 1.

customer service, "following up" with Relationship Managers, that is, Bank employees who served Private Banking customers, and creating and evaluating compensation files.

The Bank alleges and the Plaintiff does not dispute that the Bank's reason for transferring her to the Private Bank Referral Campaign was to place her in a position that focused on her strengths, that is, data entry and customer service. The Plaintiff acknowledges in her brief that she required "advanced technical assistance" from Ms. Chapman in performing the compensation-related functions of her new job. See Document #14 at 2.

The Plaintiff performed the tasks associated with the Private Bank Referral Campaign in 2001 and 2002, and she makes no allegation that Mr. Miller, Ms. Chapman or anyone ever subjected her to any form of discrimination during that period.

It is undisputed that at the end of 2002, the Bank closed the Private Bank Referral Campaign, that is, the Bank began to use other, more sophisticated methods for compensating and rewarding employees who made referrals to the Private Bank Group. The Plaintiff admits that she and the other Project Analysts in the Private Bank Referral Administration Unit were expected to take on new and different responsibilities, including performing a more complex financial analysis to determine whether a particular referral had been profitable prior to paying the referral fee to the referring employee. At this time, the Plaintiff began reporting directly to Ms. Chapman.

Ms. Chapman avers that although she coached the Plaintiff to develop her analytical skills, the Plaintiff continued to require step-by-step instructions to perform analytical tasks that she, as a Project Analyst, should have been able to perform. In her brief, the Plaintiff twice admits that she was unable to perform the technical aspects of her job, that is, that she "did not have the correct [personal] tools to be successful," but contends generally that Ms. Chapman's insistence that she

3

improve her performance was the product of unlawful racial animus. See document #14 at 6-7.

Sometime in June 2003, Ms. Chapman began a transition to another position within the Bank, and during the transition period, the Plaintiff reported both to Ms. Chapman and to Julie Dengler, her new supervisor, who assumed responsibility for the day-to-day operations of the Private Bank Referral Administration Unit.

The Plaintiff alleges that sometime in August 2003, Ms. Chapman provided her "informal coaching" over lunch, and "gave the Plaintiff three [unspecified] options if the direction in which the department was going in was not good for the Plaintiff." Document #14 at 3. More specifically – and not inconsistently with the Plaintiff's allegations – Ms. Chapman avers that she advised the Plaintiff to explore other options within the Bank, to consider other opportunities within the Private Bank Referral Administration Unit, or to improve her performance.

Sometime in September 2003, Ms. Chapman instructed the Plaintiff to complete weekly action plans so that her performance could be tracked. Ms. Chapman avers that after the Plaintiff still failed to improve her performance, she decided to place the Plaintiff on a ninety-day "performance plan."

On October 10, 2003, Ms. Chapman and Ms. Dengler met with Plaintiff to review her performance and inform her of the performance plan. The Plaintiff was given specific goals, including, for example, "becoming more comfortable managing data." [3]

On November 4, 2003, Ms. Chapman and Ms. Dengler met with Plaintiff to review her

---

[3] In addition, Plaintiff was given a written warning for excessive absenteeism during this meeting, although there is no indication in the record that Plaintiff's alleged absenteeism was related to her termination.

October performance. Plaintiff was presented with a performance summary which set forth Plaintiff's job duties and outlined where Plaintiff was and was not meeting expectations. The Plaintiff admitted in her deposition that during the meeting, she became "very upset" and "raised [her] voice" to Ms. Chapman and Ms. Dengler, both of whom aver that the Plaintiff also stood up as she was talking loudly and shook her finger very near Ms. Dengler's face. The Plaintiff admits that she left the meeting prior to being released by her superiors, describing what occurred as "dismiss[ing] herself from the meeting." Document #14 at 4.

It is undisputed that Ms. Chapman reported the Plaintiff's insubordination, including both the conduct the Plaintiff admits and her observation of the Plaintiff shaking her finger in Ms. Dengler's face, to her supervisors, Pam Morrison, Group Operations Manager, and Joe Gentile, the Defendant's Senior Vice President of Executive Finance and the head of its Private Bank Group. Based on this report it is likewise undisputed that Mr. Gentile decided to terminate the Plaintiff.

Early on November 6, 2003, Ms. Chapman met with Plaintiff and advised her that her employment was being terminated due to her conduct during the November 4, 2003 meeting, but that she would be kept on the Bank's payroll through the end of November to give her time to find other employment in the Bank. An initial Separation Notice, prepared that day by Ms. Dengler at Ms. Chapman's direction and placed in Plaintiff's personnel file, showed that she was "eligible for rehire." Exhibit #1 to "Supplemental Affidavit of April Chapman," attached to Defendant's "Reply ..." (document #15). The Plaintiff testified that Ms. Chapman also told her that she could use her office telephone and computer to look for another position within the Bank.

The Plaintiff returned to her desk and began to contact other supervisors and managers within

5

the Bank concerning possible job openings. The Plaintiff denies that she said anything inappropriate during these conversations or in her e-mails. However, Ms. Chapman avers that later the same day, she began to receive telephone calls from Bank employees reporting that Plaintiff was contacting them and discussing and complaining about the circumstances of her termination.

It is undisputed that later on November 6, 2003, Ms. Chapman instructed the Plaintiff "to get her things and leave" the office due to her alleged ongoing disruptive behavior. Prior to leaving, the Plaintiff "cleaned out her desk," and placed documents in several recycling bins located throughout the floor of the building where she worked. Ms. Chapman avers that included among those documents were many that should <u>not</u> have been destroyed, and that upon noticing their absence from the Plaintiff's work area, she (Ms. Chapman) retrieved at least some of them from the various recycling bins.

Ms. Chapman further avers that the same day, because the Plaintiff had tried to destroy important documents, which she believed to be in retaliation for being told to leave the building, she changed the Plaintiff's employment status from eligible to ineligible for rehire, that is, she instructed Ms. Dengler to place an amended Separation Notice in the Plaintiff's personnel file indicating that she was not to be rehired by the Bank. <u>See</u> Exhibit #2 to "Supplemental Affidavit of April Chapman," attached to Defendant's "Reply ..." (document #15). Although the Plaintiff states in her brief that Ms. Chapman's "beliefs of why the Plaintiff put the files in [the recycling] bins were incorrect," she does not dispute that documents she placed in the recycling bins should <u>not</u> have been discarded. <u>See</u> Document #14 at 5.

The next day, November 7, 2003, the Plaintiff filed an administrative charge of wrongful

termination based on race with the Equal Employment Opportunity Commission ("EEOC"), which sometime later issued the Plaintiff what is commonly called a "right to sue" letter. The Plaintiff contends that Ms. Chapman did not decide to change her rehire status to "ineligible" until after she learned of and in retaliation for the Plaintiff's EEOC charge. As discussed above, however, the Plaintiff's personnel file reflects that her rehire status was changed on November 6, 2003, and the Plaintiff has offered no evidence to the contrary.

Concerning the Plaintiff's allegation that she was the victim of post-termination retaliation, as noted above, it is significant that the Bank did not immediately remove the Plaintiff from its payroll. This is confirmed by the fact that sometime prior to November 30, 2003, the date she had been scheduled to be removed from the payroll, the Plaintiff applied for short term disability ("STD") leave to have an elective surgical procedure. Rather than avoiding the claim of a dismissed and separated employee, Ms. Chapman <u>approved</u> the Plaintiff's request, the Plaintiff underwent the surgery, and her health insurance covered it. The Plaintiff's other employee benefits also remained in effect, and she received STD benefits, through February 9, 2004. A final Separation Notice reflects that the Plaintiff's STD eligibility expired and she was terminated on that (and no earlier) date.

On September 7, 2004, the Plaintiff filed a timely Complaint in the Superior Court of Mecklenburg County, North Carolina, alleging claims for wrongful termination based on race and retaliation in violation of Title VII. The Plaintiff also initially alleged claims under the ADA, FMLA, and the Fourteenth Amendment, which, as noted above, she abandoned in her "Response." <u>See</u> Document #13 at 1.

On September 24, 2004, the Defendant removed the state action to federal court, alleging federal question jurisdiction. Removal has not been challenged and appears proper.

On August 1, 2005, the Defendant filed its "Motion for Summary Judgment" (document #9).

On August 31, 2005, and after being informed by the Court of the procedure for, and requesting and receiving an extension of time in which to do so, the Plaintiff filed her "Response to Motion for Summary Judgment" (document #13) and "Memorandum ... in Support of Response" (document #14).

Because the Plaintiff has abandoned her purported ADA, FMLA, and constitutional claims, as well as for the reasons stated in the Defendant's "Memorandum in Support" (document #10), the Defendant's Motion for Summary Judgment must be <u>granted</u> as to those claims. However, because the Plaintiff's Response not only opposes the Bank's Motion for Summary Judgment on her Title VII claims, but also contends that summary judgment should be granted to her, the Court has given her the "benefit of the doubt," treating the <u>pro se</u> Plaintiff's Response as a Cross-Motion for Summary Judgment.

The parties' motions have been briefed as set forth above and are, therefore, ripe for disposition.

## II. <u>DISCUSSION</u>

A. <u>Summary Judgment Standard</u>

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as

to any material fact and. . . the moving party is entitled to a judgment as a matter of law." Accord Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. Defendant's Motion for Summary Judgment

#### 1. Wrongful Termination Based on Race

Title VII makes it an unlawful employment practice for an employer:

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

9

In order to prove a Title VII wrongful termination claim, an employee may proceed under ordinary principles of proof using direct or indirect evidence, or under the paradigm for indirect proof of employment discrimination set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  See  Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996), citing Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988).

To overcome a summary judgment motion based upon direct or indirect evidence of discrimination, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F. 3d 598, 607 (4th Cir. 1999), quoting Goldberg, 836 F.2d at 848. Accord  Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995) (to overcome summary judgment, plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision").  In this case, the Plaintiff has submitted no direct evidence of racial discrimination in the Defendant's decision to terminate her.

Under the alternative proof scheme established in McDonnell-Douglas, if the employee establishes a prima facie case of illegal discrimination (as discussed below), the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision. 411 U.S. at 802.  If the employer does so, the presumption of discrimination "drops from the case," and the employee must demonstrate that the employer's stated reason for its action was, in fact, a pretext for improper discrimination.  Id. at 804.

The Supreme Court has made clear that the plaintiff at all times "bears the ultimate burden

of proving ... intentional discrimination." Runnebaum v. NationsBank of Maryland, 123 F.3d 156, 164 (4th Cir. 1997) (en banc), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993) (holding that prima facie case plus disbelief of employer's asserted justification insufficient to survive summary judgment). However, in Reeves v. Sanderson Plumbing Prods., Inc., the Supreme Court held that:

> a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.

530 U.S. 133, 147-48 (2000) (emphasis added). Accord Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000) ("In Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not automatically create a jury question, but it may do so.")

Finally, it is well settled that the perception of the decision-makers alone, not the plaintiff, her co-workers or other third parties, is relevant to the question of discrimination. See, e.g., Tinsley v. First Union Nat. Bank, 155 F.3d 435, 444-45 (4th Cir. 1998); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996); and Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991).

As the Fourth Circuit has stated, in order to establish a prima facie case of unlawful discrimination in the enforcement of employee disciplinary measures leading to wrongful termination under Title VII, a plaintiff must show that: "(1) [she] is a member of a protected class; (2) [she] was qualified for [her] job and [her] job performance was satisfactory; (3) [she] was fired; and (4) other employees who are not members of the protected class were retained under apparently

similar circumstances." Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002), citing, Hughes v. Bedsole, 48 F.3d 1376, 1384 (4th Cir. 1995); and Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993). See also Taylor v. Virginia Union Univ., 193 F.3d 219, 234 (4th Cir. 1999).[4]

Applying these principles to this case, even taking the facts in the light most favorable to the Plaintiff, she has failed to establish a prima facie case of wrongful termination based on race. The Plaintiff is African-American, that is, a member of a protected class, who was terminated, and accordingly, she has satisfied the first and third prima facie elements. However, she has not established that her job performance was satisfactory or that other, non-African-American employees were retained under apparently similar circumstances.

Indeed, the Plaintiff admits in her brief that her job performance was never better than "consistent"; that once the Bank's Private Bank Referral Campaign ended and the Project Analysts in her unit were expected to perform more complex financial analysis, she lacked the "tools" to do her job; and that she required Ms. Chapman's assistance in performing the technical aspects of her job. The Plaintiff's subjective belief that Ms. Chapman's subsequent decisions – to counsel Plaintiff to either improve her performance or seek another position within the Bank and to place the

---

[4] Prior to the Fourth Circuit's issuance of Bryant, there was a split between Hughes, Taylor, and their progeny, and Brown v. McLean, 159 F.3d 898, 905-06 (4th Cir. 1998) (fourth factor of prima facie case required showing that plaintiff was replaced by employee not a member of protected class), which has not been cited in other published Fourth Circuit opinions. Although recognizing that unpublished cases have no precedential value, the undersigned notes that notwithstanding the Brown opinion, panels continued to apply the fourth factor as stated in Hughes that "other employees who are not members of the protected class were retained under apparently similar circumstances," 48 F.3d at 1384. See Coston v. Sears Roebuck and Co., 191 F.3d 447, 1999 WL 739439 (4th Cir. 1999). Moreover, following the Brown decision, but prior to Bryant, district courts continued to apply the Hughes version of the fourth factor. See Mathews v. Giant Food, Inc., 187 F.Supp.2d 486, 488 (D. Md. 2002).

Plaintiff on a performance improvement plan – were actually manifestations of race-based animus is insufficient to create a material issue of fact as to whether she was performing at an acceptable level. Accord Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995) (unsupported speculation insufficient to defeat summary judgment).

Nor has the Plaintiff offered any evidence that non-African-American employees were retained under circumstances apparently similar to those leading to her termination. Indeed, the Plaintiff has not identified any employee with a borderline or inferior job performance who engaged in admitted insubordinate conduct who was nevertheless retained.

Even assuming arguendo that the Plaintiff had established a prima facie case, the Defendant has offered evidence that Mr. Gentile decided that the Plaintiff was to be terminated because she engaged in rude and insubordinate conduct towards Ms. Chapman and Ms. Dengler. Accord Tinsley, 155 F.3d at 444-45 (perception of the decision-maker alone, not the plaintiff, her co-workers or other third parties, is relevant to question of discrimination). In other words, the Defendant has "articulate[d] some legitimate, non-discriminatory reason for its employment decision." McDonnell-Douglas, 411 U.S. at 802. The burden, therefore, shifts back to the Plaintiff to establish that the Defendant's stated reasons are "merely pretextual" and to carry her "ultimate burden of proving intentional discrimination." Runnebaum, 123 F.3d at 164, citing, St. Mary's Honor Ctr., 509 U.S. at 506-11.

For the same reasons that the Plaintiff has failed to establish a prima facie case, she also cannot rebut the Defendant's proffered non-discriminatory explanations for her termination. To the contrary, the circumstances surrounding the Plaintiff's termination, taken in the light most favorable

to the Plaintiff, support the Defendant's contention that it did <u>not</u> discriminate against the Plaintiff.

As has been noted, despite reporting the Plaintiff's insubordinate conduct to Mr. Gentile and supporting her termination, Ms. Chapman initially concluded that the Plaintiff <u>should</u> be eligible for rehire in another part of the Bank and allowed the Plaintiff more than two weeks to find a new position before her termination would be effective. Indeed, even following discovery of the Plaintiff's attempt, for whatever reason, to destroy company documents, and with her termination due to take effect on November 30, 2003, Ms. Chapman granted the Plaintiff's request for short term disability leave and allowed the Plaintiff to remain on the Bank's payroll, receiving STD payments, health insurance, and other employee benefits, through the expiration of her STD eligibility in February 2004.

In short, where the Plaintiff has failed to demonstrate the existence of a prima facie case of unlawful discrimination or to raise a material issue of fact as to whether the Defendant's stated reason for her termination was "pretextual," the Defendant's Motion for Summary Judgment must be <u>granted</u> as to the Plaintiff's Title VII claim for wrongful termination based on race.

### 2. <u>Retaliation</u>

As noted above, the Plaintiff contends that Ms. Chapman retaliated against her for filing an EEOC charge by changing her employment status from eligible to ineligible for rehire. Title VII prohibits employers from retaliating against employees who attempt to enforce their rights under the Act. 42 U.S.C. § 2000e-3(a).[5]

---

[5] Title 42 U.S.C. §2000e-3 specifically provides as follows:

In order to establish retaliation in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the adverse action. Rhoads v. F.D.I.C., 257 F.3d 373, 392 (4th Cir. 2001) (reversing summary judgment granted as to plaintiff's retaliation claim), citing Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997). See also Hopkins v. Baltimore Gas and Electric Company, 77 F.3d 745, 754 (4th Cir. 1996); and Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, "the employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." Rhoads, 257 F.3d at 392. If the employer does so, the plaintiff "must demonstrate that the proffered reason is a pre-text for forbidden retaliation" and, moreover, "always bears the ultimate burden of persuading the trier of fact that he was the victim of retaliation." Id.

As the Fourth Circuit held in Rhoads, after taking the evidence in the light most favorable to the plaintiff, any resulting reason to disbelieve the defendant's proffered nonretaliatory reason for the disputed action "is certainly sufficient evidence [for the plaintiff] to overcome [a defendant's] motion for summary judgment." 257 F.3d at 394, citing Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

---

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The Defendant concedes that the Plaintiff has established the first two elements of a prima facie retaliation claim, that is, she filed an EEOC charge and her rehire status was changed from eligible to ineligible, but persuasively denies that the Plaintiff has established a causal connection between the protected activity and the adverse action. <u>See</u> Defendant's "Memorandum ... in Support ... " at 13-15 (document #10).

As discussed above, the evidence establishes that Ms. Chapman changed the Plaintiff's rehire status from eligible to ineligible on November 6, 2003, the day <u>before</u> the Plaintiff filed her EEOC charge. Thus, even in the light most favorable to the Plaintiff, her proof plainly fails to establish the third element (a sufficient causal connection between the protected activity and the adverse employment action).

Moreover, even if the Plaintiff could establish a prima facie case, she has not presented evidence remotely sufficient to rebut the Defendant's stated nonretaliatory reason for changing her rehire status. Although the Plaintiff disputes that she placed the documents in the bins because she was angry about her termination, she essentially concedes that the documents should not have been discarded and has presented no evidence that her conduct was for any proper reason. Finally, for the same reasons discussed above concerning her wrongful termination claim, Ms. Chapman's decision to allow the Plaintiff to remain on short term disability leave for three months beyond the date she filed her EEOC charge further belies the Plaintiff's claim that she was the victim of actionable retaliation.

Accordingly, where taking the evidence in the light most favorable to the Plaintiff, she has failed to establish a prima facie case of retaliation or to raise an issue of material fact as to whether

the Defendant's stated reason was merely a pretext for retaliation, the Defendant's Motion for Summary Judgment must also be granted as to the Plaintiff's retaliation claim.

### C. Plaintiff's Cross-Motion for Summary Judgment

Because the pro se Plaintiff's Response to the Defendant's Motion for Summary Judgment asks the Court to enter summary judgment in her behalf, her Response has been construed as a "Cross-Motion for Summary Judgment," which for the reasons stated above is hereby denied.

### III. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. The Plaintiff's Cross-Motion for Summary Judgment contained in her "Response to [Defendant's] Motion for Summary Judgment" (document #13) is **DENIED**.

2. The Defendant's "Motion for Summary Judgment" (document #9) is **GRANTED**; and the Complaint is hereby **DISMISSED WITH PREJUDICE**.

3. The Clerk is directed to send copies of this Memorandum and Order to the pro se Plaintiff; and to defense counsel.

**SO ORDERED, ADJUDGED, AND DECREED.**

**Signed: September 23, 2005**

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge